**Robert H. MORAST, Plaintiff,**

**v.**

**T. Bertram LANCE, David J. Lance, Cahoun First National Bank, Clifford M. Booker, Desmond Cummings, Tom B. David, Clarence E. Harris, Dean D. Hayes, Jack Holland, Thomas B. Lance, Jr., J.C. Maddox, James S. Owens, Paul J. Whittemore, Northwest Georgia Computer Services, Inc. and the Kris Company, Defendants.**

**Civ. A. No. C85–311R.**

United States District Court,
N.D. Georgia,
Rome Division.

March 31, 1986.

David G. Archer, Archer & Howell, Cartersville, Ga., for plaintiff.

Anthony L. Cochran, Chilivis & Grindler, Atlanta, Ga., Bobby Lee Cook, Cook & Palmour, and L. Branch, and S. Connelly, Summerville, Ga., William P. Bailey, Charles M. Williams, Howard W. Jones, Jones & Murphy, and Groze Murphy, Jr., Ronald F. Chance, Sr., Chance & Maddox, T. Joseph Campbell, Calhoun, Ga., for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on defendants' motions to dismiss and several other

motions. The defendants have moved the Court to dismiss the complaint on various grounds including a failure to state a claim upon which relief can be granted and on the grounds that the Court lacks subject matter jurisdiction. For the reasons which follow, defendants' motions shall be granted and the case dismissed.

## BACKGROUND

The allegations of the complaint, which will be accepted as true for the purposes of these motions, may be summarized as follows. The plaintiff, Robert H. Morast, was for some four years Executive Vice President of the Calhoun First National Bank (Bank). On June 12, 1985, he was fired from that position and on October 3, 1985, he filed his complaint in this action. In his nine-count complaint the plaintiff asserts that his firing was wrongful and in violation of federal civil rights statutes, federal and state RICO statutes, and in violation of other statutory and case-law provisions.

As Executive Vice President of the Bank, the plaintiff was responsible for the operation of the Bank's branches, and its personnel, cashiers, purchases, tellers, new accounts, savings, bookkeeping and data processing. Plaintiff states that he was consistently praised for his performance and ability. In addition to his duties at the Bank, plaintiff served as president and member of the board of directors of Northwest Georgia Computer Services, a wholly owned subsidiary of the Bank, for which service he received praise as well.

On October 12, 1984, plaintiff alleges that he was notified of an irregular financial transaction relating the bank accounts of T. Bertram Lance (Bert Lance), then the Chairman of the Board of Directors and Executive Committee of the Bank. Plaintiff alleges that on that date he was informed by Vice Chairman Marvin Taylor (Taylor) and Comptroller Lamar Harrison (Harrison) that, two days before, Bert Lance's personal secretary had contacted a Bank officer and requested a cashiers check for $86,500.00 for Beverly Lance, Bert Lance's son, to be issued payable to The Kris Company, a corporation owned by Bert Lance's family.

The Bank officer had issued the cashiers check against no offsetting funds. Plaintiff discussed this fact with Taylor and Harrison and two other Bank officers. Plaintiff found that no funds had been received to offset the cashiers check since it had been drawn two days before. Plaintiff and Taylor then sought legal advice from the Bank's attorney, James B. Langford (Langford) on the same day. Plaintiff brought with him copies of the suspected transaction.

Langford, also a Director of the Bank, advised the two to go to the Atlanta office of the Comptroller of the Currency to report the transactions. The Plaintiff and Taylor then went to the office of Bank attorney and Director J.C. Maddox (Maddox) to show him the transaction and to review the Comptroller of the Currency Manual. Plaintiff states that Maddox, after studying both the transaction and the Manual, advised the plaintiff and Taylor to go to the Comptroller of the Currency. The plaintiff states that he and Taylor asked Maddox whether they ought to wait until Bank President David J. Lance (David Lance) returned from a trip. Maddox advised them that the matter could not wait.

Subsequently, on the same day at approximately 3:55 pm, the plaintiff, Taylor and Maddox met at the Office of the Comptroller and provided copies of the suspected transaction to two employees in the Comptroller's office. The plaintiff was told that an examiner from the Office of the Comptroller would be sent to the Bank to review the suspected transactions.

The following day, the plaintiff, Taylor and Maddox, requested a meeting with Bert Lance and David Lance (who had returned). Present at the meeting were David Lance, Bert Lance, Taylor, Harrison, Langford, Maddox and a Trust officer. According to the plaintiff, David and Bert Lance became very angry when informed of plaintiff's report to the Office of the Comptroller.

On October 15, 1984, the plaintiff, Taylor and Maddox signed a report concerning the suspected transactions for the Comptroller prepared by an attorney for the Bank and the Lance's. The next day an examiner from the Comptroller's office arrived to begin an investigation. On November 8, 1984, an agent of the Federal Bureau of Investigation visited the Bank in response to the report signed by the plaintiff, Taylor and Maddox.

On November 19, 1984, Taylor was fired by the Bank, with the approval of the Board of Directors. On June 12, 1985, the plaintiff was fired, with the approval of the Board of Directors. Plaintiff's complaint states that the firing was without justification and was motivated solely by personal malice towards the plaintiff and in retaliation for his participation in filing the report with the Office of the Comptroller and co-operating in the investigation by the Comptroller of the Bank.

Plaintiff, as noted above, has nine counts to his complaint. The Court will deal with the counts seriatim.

### VIOLATION OF 42 U.S.C. § 1985(1)

■ 42 U.S.C. § 1985(1) provides as follows:

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

As has been noted elsewhere, the language of the statute provides protection only to federal officers. Its purpose is to proscribe conspiracies which interfere with the performance of official duties by federal officers. *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). The plaintiff's complaint argues that, as a bank officer, he was a "person holding an office trust or place of confidence 'under the United States' ". He contends that by firing him for his actions the defendants were preventing him, as a federal officer, from discharging his duties. Such a strained reading of this statute cannot withstand scrutiny. Banks are heavily regulated by the federal government, and their officers are legally bound to ensure that the banks comply with the regulations. But such a duty does not make one a federal officer. We are all bound by the laws of the land, and by extension of plaintiff's argument, all citizens are federal officers. But the protections of section 1985(1) do not reach so far. It clearly does not extend to private individuals or to non-federal officials. *See, Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d 711, 717 (1981); *Miller v. Indiana Hosp.,* 562 F.Supp. 1259, 1281 (W.D.Pa.1983). Merely because banks are regulated by the federal government does not make them federal agencies. *See, Lewis v. United States,* 680 F.2d 1239, 1241 (9th Cir.1982) (fact that Federal Reserve Board regulates banks does not make them federal agencies for purposes of the Federal Tort Claims Act). Nor, by logical extension, are their officers federal officers. Plaintiff cannot show that he is within the class of persons sought to be protected by the act.

### VIOLATION OF 42 U.S.C. § 1985(2)

■ Under this section of the Civil Rights statute, the plaintiff has alleged that the defendants obstructed justice by intimidating the plaintiff as a witness in proceedings before the Office of the Comptroller of the Currency. The statute reads in relevant part:

> If two more more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testi-

fying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified ...

Plaintiff's complaint states in conclusory terms, drawn from the text of the statute, that the defendants conspired to deter, by force or intimidation, plaintiff as a witness. The only concrete actions complained of were that the defendants were "angry, upset and vindictive" toward the plaintiff; that they questioned the plaintiff about the source of leaks to the press about the Comptroller's investigation, implying that plaintiff was a possible source; and, that plaintiff was excluded from board meetings and given a decreased work load. Yet plaintiff's own complaint states specifically that he "would not cooperate with Defendants' conspiracy", that he performed "his duties in making said reports and in cooperating with and testifying in federal proceedings concerning the investigations." Nowhere does he assert, in the language of the statute, that he did not testify "freely, fully and truthfully." The Court notes that plaintiff's testimony would in all likelihood never be known to defendants as under 12 CFR § 19.43, such investigations are confidential, and plaintiff's testimony was taken without the presence of any defendants or their representatives. Plaintiff's complaint is essentially void of the factual allegations necessary to support a claim under section 1985(2). *See generally, Jaco v. Bloechle,* 739 F.2d 239, 245 (1984).

■ Further, only "direct interference with the federal courts is prohibited" by the plain language of the statute. *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 348 (5th Cir.1981). No allegations were made that plaintiff was injured because he appeared or testified in federal court.[1] Finally, the allegation that plaintiff was injured in his "person or property," cannot stand. The function of a conspiracy action for a

violation of civil rights is compensatory. The plaintiff must have suffered an actual injury to make out a cause of action. For reasons that shall be discussed later, plaintiff, as an at-will employee, had no constitutionally cognizable property interest in his job. Therefore his only complained of injury, his loss of employment, cannot suffice to state a claim under this statute.

## VIOLATION OF 42 U.S.C. § 1986

■ Under 42 U.S.C. § 1986, a further cause of action is created for those persons who have made out claims under § 1985. A complaint will not sufficiently allege a cause of action under section 1986 unless it successfully alleges a conspiracy prohibited under section 1985. *See, Dowsey v. Wilkins,* 467 F.2d 1022 (5th Cir.1972). As plaintiff has not successfully alleged any violation of section 1985, no cause of action exists under section 1986. *See, Hamilton v. Chaffin,* 506 F.2d 904 (5th Cir.1975).

## "BIVENS" CLAIM

■ The Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), created a federal cause of action for a violation of a person's Fourth Amendment rights by federal officers. The doctrine of *Bivens* has expanded over time to stand for the proposition that victims of constitutional violations committed by federal officials have a right to recover damages without the need for an authorizing statute. *See, Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Its possible extension to private persons, while never determined by the Supreme Court, has been considered before. In rejecting the application of *Bivens* to a newspaper, the District of Columbia Court of Appeals noted that:

... a defendant's private status should at least "counsel hesitation" in the cre-

---

1. Nor does plaintiff present a situation calling for an exception to the language of the statute as found in *Irizarry v. Quiros,* 722 F.2d 869 (CA Puerto Rico 1983). There, plaintiffs were migrant farm workers refused employment for

filing claims with administrative agencies and the court found that plaintiffs had "instituted legal actions to vindicate their federal rights." 722 F.2d at 871. No primary federal right of the plaintiff has been nullified here.

ation of *Bivens* liability, for the primary purpose of the *Bivens* doctrine is to remedy abuses by those who act as agents for the sovereign.

*Zerilli v. Evening News Ass'n.*, 628 F.2d 217, 224 (D.C.Cir.1980). While a cause of action for damages against private citizens based on *Bivens* may someday be appropriate, plaintiff has made no argument to justify its application here. The regulation of the banking industry, as noted in the Court's discussion of section 1985(1), does not make bank officers federal agents for the purposes of *Bivens* liability.

### VIOLATION OF 12 U.S.C. § 93

■ Section 93 states that if the directors of any national banking association knowingly violate, or knowingly permit any of their employees or agents to violate, the provisions of title 12, they shall forfeit all rights, privileges, and franchises of the bank. The statute further states that:

> Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved.

Thus, the plain language of the statute would seem to preclude suits by private parties. However, in some limited circumstances, courts have permitted shareholders directly injured by the violation to bring actions in their own behalf against the bank's directors. *See, Chesbrough v. Woodworth*, 244 U.S. 72, 37 S.Ct. 579, 61 L.Ed.2d 1000 (1917); *Harmsen v. Smith*, 542 F.2d 496 (9th Cir.1976). Shareholders have also been permitted to bring a derivative suit under section 93 on behalf of the bank. *Corsicana National Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919); *Spalitta v. National American Bank of New Orleans*, 444 F.2d 291 (5th Cir.) *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 164 (1971). But these and other cases have not created the absolute availability of a private remedy for a violation of section 93(a). *See, Golar v. Daniels & Bell, Inc.*, 533 F.Supp. 1021 (D.C.N.Y.

1982). The function of such a claim is to permit private actions for injuries to the individual directly caused by the violations, or to permit individuals to act on behalf of the bank in some instances. *But cf., Harmsen v. Smith*, 542 F.2d 496 (9th Cir. 1976) (holding section 93 does not permit minority shareholder to recover for injuries done to bank). Clearly then, persons seeking a private right of action under section 93 must allege "damages sustained as a result of violations of the National Bank Act". *See, Seiden v. Butcher*, 443 F.Supp. 384, 385 (D.C.N.Y.1978). For example, one who buys stock in a bank, in reliance upon a false report of its conditions, and suffers damage as a result, may well have a cause of action. *See, Chesbrough v. Woodworth*, 244 U.S. 72, 76, 37 S.Ct. 579, 582 (1917). No such allegations are made here. Plaintiff has not alleged any financial damage as a result of any violations of the act directly, but only that as a result of reporting those violations he lost his job. Such a use of a private action under section 93(a) goes beyond the range of private plaintiffs appropriate to the purpose of the statute. Plaintiff cannot use this statute as a means to recover for the loss of his job.

### VIOLATION OF 18 U.S.C. § 1964 (RICO)

■ Plaintiff has alleged that his firing was part of a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (RICO). Specifically, plaintiff seeks recovery under that portion of RICO that provides a private civil action to recover treble damages for injury "by reason of a violation of" its substantive provisions. 18 U.S.C. § 1964(c).

■ The Supreme Court has recently considered the requirements for bringing a section 1964(c) action in *Sedima v. Imrex Company, Inc.*, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Supreme Court held that:

> Where the plaintiff alleges each element of the violation, the compensable injury

necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise ... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Sedima,* —— U.S. at ——, 105 S.Ct. at 3286. Defendants argue that nowhere in the complaint does plaintiff allege that he has been injured by the conduct constituting the alleged violation. A plaintiff lacks standing under section 1964(c) where his injury does not flow from the predicate acts which make the defendant's actions unlawful. *See, Morosani v. First Nat. Bank of Atlanta,* 581 F.Supp. 945, 948 (N.D.Ga. 1984) *citing, Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A party, indirectly injured by a RICO offense, does not have standing to bring a RICO claim. *See, CENCO Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982) (accountants who were "unwitting tools" of the RICO violator, do not have standing under RICO for damage to their business). *See also, Warren v. Manufacturers National Bank of Detroit,* 759 F.2d 542 (6th Cir.1985) (plaintiff, bank president, had no standing under RICO for loss of employment due to bankruptcy.) *But cf., Alexander Grant & Co. v. Tiffany Industries,* 742 F.2d 408 (8th Cir.1984) (finding no legislative support for indirect-direct injury dichotomy).

Defendants argue that plaintiff's loss of employment was not a predicate act for the purposes of establishing a violation of section 1962 and thus he has made no claim upon which relief can be granted under section 1964(c). There can be standing to sue and recovery only "to the extent that, he has been injured ... by the conduct constituting the violation." *Sedima, supra,* —— U.S. at ——, 105 S.Ct. at 3285–3286.

The plaintiff urges the Court to consider the holding in *Callan v. State Chemical Mfg. Co.,* 584 F.Supp. 619 (C.D.Ill.1984).

The *Callan* court granted standing under section 1964(c) to former sales representatives of a chemical company who alleged they were discharged for refusing to engage in commercial bribery pursuant to company policy. The court noted that the "predicate offense, commercial bribery, did not in and of itself harm the plaintiffs." *Callan, supra,* at 623. However, the court concluded that the injury to the plaintiffs through the loss of their jobs due to their refusal to adopt the illegal sales tactics "alleged an injury 'by reason of' a violation of § 1962." *Id.* at 623 Similarly here, the plaintiff, while not injured by the predicate acts for a violation of § 1962, argues that he was injured in the loss of his employment following his effort to report the predicate acts to the Comptroller. *See also, Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983).

However, the Court is not convinced of the applicability of *Callan* to this case. The plaintiff has not alleged damages that "flow from the commission of the predicate acts." *Sedima, supra,* —— U.S. at ——, 105 S.Ct. at 3284. Plaintiff is not seeking to use the RICO statute as a "sword against organized crime", *Callan,* 584 F.Supp. at 622, but as a source of recovery for his loss of employment. The statute, even given the current broad reading of the Supreme Court in *Sedima,* will not stretch that far.

### VIOLATION OF O.C.G.A. § 16–14–4 (RICO)

Plaintiff's claim under Georgia's RICO statute, O.C.G.A. § 16–4–1 et seq., mirrors his federal RICO claim. The terms of section 16–14–6(c) (persons injured by reason of section 16–14–4 have a cause of action) and section 16–14–4 (prohibited activities) are similar enough to the federal RICO statute to apply the same analysis. For the reasons stated above, the motion to dismiss will be granted.

### TORTIOUS INTERFERENCE WITH EMPLOYMENT RIGHTS

Plaintiffs complaint alleges that he has a "property right in his employment with De-

fendant Bank and in his employment with Defendant Northwest Georgia Computer Services, Inc." As plaintiff noted in his reply brief, filed December 9, 1985, "It is the task of Plaintiff in his Complaint and in this Brief to persuade the Court that the 'at-will termination' rules are not applicable ... to Plaintiff in the instant case."

Regrettably for the plaintiff, nothing in his complaint or his reply brief has persuaded the Court that his term of employment could not be terminated at-will. The Court recognizes the "basic unfairness of the rule than an employee at will may be discharged for any reason and that '[t]he motives of the employer in discharging his employee at will are legally immaterial.'" *See,* Martin, *Annual Survey of Georgia Law—Contracts,* 34 Mercer L.Rev. 71, 86, *quoting, Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978) (per curiam). But it is a rule nonetheless.

The Georgia statute, O.C.G.A. § 34–7–1, states that "An indefinite hiring may be terminated at will by either party." The Georgia courts have consistently rejected efforts to state a cause of action for an improper discharge. *See, McElroy v. Wilson,* 143 Ga.App. 893, 240 S.E.2d 155 (1977) (conspiracy to discharge); *Goodroe v. Ga. Power Co.,* 148 Ga.App. 193, 251 S.E.2d 51 (1978) (discharge to cover up criminal activity). In Georgia, an "at will" employee may be removed "with or without cause, and regardless of motive". *Elliot v. Delta Airlines, Inc.,* 116 Ga.App. 36, 156 S.E.2d 656 (1967).

Furthermore, 12 U.S.C. § 24, provides that national banks shall have the power:

[to] elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, *dismiss such officers or any of them at pleasure,* and appoint officers to fill their places.

(emphasis added) Courts have interpreted this statute to allow a bank covered by title 12 to remove officers at will. *See, McWhorter v. First Interstate Bank of*

*Oregon, N.A.,* 67 Or.App. 435, 678 P.2d 766 (1984).

■ In seeking to avoid the clear intent and application of the at-will doctrine, and state and federal statutes, plaintiff makes several arguments. First, he asserts that the bank directors were third parties in relation to his employment at Northwest Georgia Computer Services, and that therefore their role in his discharge from his position there was tortious interference with employment rights by a third party. However, in plaintiff's complaint he alleges that Northwest Georgia Computer Services Inc. is a wholly owned subsidiary of the bank, and that it is "directly under the control of and pursuant to the authority of" the board of directors of the bank. It is difficult to perceive how the defendants could thus have acted as third parties in removing plaintiff from both positions of employment.

■ Secondly, plaintiff suggests that bank directors could be considered third parties and seeks to overlay the at-will doctrine with cases involving the piercing of the "corporate veil" to sue directors for tortious misconduct when their actions evidence a personal motivation. The Supreme Court of Georgia has held that a supervisor with the absolute right to discharge an employee cannot be liable for wrongful discharge, regardless of his motives. *Georgia Power Co. v. Busbin,* 242 Ga. 612, 613, 250 S.E.2d 442 (1978). Even where supervisors have acted out of motivations contrary to the best interest of the corporate entity, they may only be liable if they lacked the actual authority to discharge an employee. *Taylor v. Foremost-McKesson, Inc.,* 656 F.2d 1029, 1032 (5th Cir.1981). No lack of authority to discharge has been shown here.

■ Thirdly, plaintiff asserts that the at-will doctrine is unconstitutional because it infringes upon his first and fifth amendment rights. The Court notes the holding in *West v. First National Bank of Atlanta,* 145 Ga.App. 808, 245 S.E.2d 46 (1978), that "Contrary to appellant's contentions,

the United States Constitution does not prohibit a private employer from firing an employee for filing a bankruptcy petition, or, for that matter, for any other reason." *West*, 145 Ga.App. at 808, 245 S.E.2d 46.

## VIOLATION OF FEDERAL AND STATE POLICY

In his final count, plaintiff alleges that the termination of his employment constitutes a violation of the public policy of the State of Georgia and the United States of America and is violative of plaintiff's Constitutional rights. The Court need not treat this issue at length, since for the reasons set out above, the at-will doctrine and the clear statutory authority of the bank to discharge plaintiff at their pleasure, disposes of plaintiff's claim. The plaintiff has presented no compelling reason to overcome the authority given to the bank under 12 U.S.C. § 24 and O.C.G.A. § 34–7–1 and the cases construing those provisions. The courts of Georgia have explicitly declined to adopt any common law exception to this State's statutory codification of the at-will doctrine. *See, Goodroe v. Georgia Power Co.*, 148 Ga.App. 193, 251 S.E.2d 51 (1978); *Taylor v. Foremost-McKeeson, Inc.*, 656 F.2d 1029 (1981).

ACCORDINGLY, defendants' motions to dismiss are GRANTED and this case is hereby DISMISSED.